IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY OLIVER, and | : | CIVIL ACTION |
| RENA SINAKIN OLIVER, h/w, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 12-4613 |
| | : | |
| U.S. DEPARTMENT OF HOMELAND | : | |
| SECURITY, | : | |
| Defendant. | : | |

**Goldberg, J.**                                                                                  **August 25, 2014**

## MEMORANDUM OPINION

### I.      INTRODUCTION

Plaintiffs, Rena and Timothy Oliver, have brought suit against Defendant, the United States Department of Homeland Security, seeking payments pursuant to a flood insurance policy purchased through the Federal Emergency Management Agency's National Flood Insurance Program. Presently before the Court are four motions filed by Defendant: a motion for summary judgment, two motions in limine, and a second motion to compel. For the reasons discussed below, the motion for summary judgment will be granted and the remaining motions denied as moot.

### II.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed unless otherwise indicated:

Plaintiffs own a house at 500 South Warminster Road in Hatboro, Pennsylvania. (Def.'s Stat. of Facts ¶ 1.) Hatboro participates in the Federal Emergency Management Agency's ("FEMA") National Flood Insurance Program ("NFIP"), which is administered pursuant to the National Flood Insurance Act of 1968, 42 U.S.C. § 4001, et seq. (Def.'s Stat. of Facts ¶ 3.)

1

FEMA is an agency of Defendant Department of Homeland Security. The NFIP was established to allow homeowners to purchase flood insurance on reasonable terms and conditions, either directly from FEMA in the form of a Standard Flood Insurance Policy ("SFIP") or from a private insurer as part of the NFIP's Write Your Own ("WYO") program. 42 U.S.C. § 4001(a); 44 C.F.R. § 59, et seq.; 44 C.F.R. § 61, App. A(1).

Communities wishing to participate in the NFIP must adopt local flood regulations that comport with federal regulations. 44 C.F.R. § 59.22; 44 C.F.R. § 60.3. To that end, FEMA issues a Flood Insurance Rate Map ("FIRM") for each participating community identifying local flood hazards. 44 C.F.R. § 59.1. Once a FIRM is issued for a particular area, new construction in hazardous flood zones must meet minimum flood plain construction standards requiring, among other things, that the living area of a home be elevated above base flood level.[1] 44 C.F.R. § 60.3(c)(2). Any part of the home below that elevation must be non-living space, used for storage, parking, or building access. 44 C.F.R. § 60.3(c)(5).

For elevated buildings in flood zones built after a FIRM is issued, coverage for damage to the first floor is strictly limited to the items listed in in SFIP Section III A(8) and B(3), which include fixtures such as electrical outlets, fuel tanks, water cisterns and similarly essential equipment. 44 C.F.R § 61, App. A(1). These coverage limits do not apply to non-elevated buildings built before a FIRM is issued. However, if a non-elevated building constructed pre-FIRM is substantially damaged by flood or substantially improved after a FIRM is in place, the building must be repaired or improved consistent with the FIRM's flood plain construction standards, such that the living area is elevated above base flood level. 44 C.F.R. § 60.3(c)(2).

---

[1] A base flood is a flood that has a one percent chance of being equaled or exceeded in any given year.  44 C.F.R. § 59.1.

Following the repairs or improvements, the post-FIRM elevated coverage limits apply. 44 C.F.R. § 61, App. A(1)(II)(B)(23).

Plaintiffs applied for an SFIP in June 2011 through FEMA.  Their application describes their house as pre-FIRM, non-elevated and located in a special flood hazard zone designated "Zone AE." (Def.'s Stat. of Facts ¶ 2; Def.'s Mot., Ex. 6, p. 6-7.) The application was approved and Plaintiffs purchased coverage in the amount of $95,800 for the house, and $47,900 for its contents. (Def.'s Mot., Ex. 7)

In late August and again in early September of 2011, Plaintiffs' house flooded due to heavy rains and sustained substantial damage. (Def.'s Br. 3; Pls.' Resp. 1.) Plaintiffs submitted a claim to FEMA, which sent an independent adjuster to assess the property. Upon inspecting the property, the adjuster was unsure whether the building was pre-FIRM and non-elevated as described in Plaintiffs' SFIP, or whether it was in fact post-FIRM and elevated. (Def.'s Mot., Ex. 11, bates no. 103.) Because of this uncertainty, the adjuster provided FEMA with two estimates—one for the policy limits of $143,700 in the event that the house was non-elevated, and one for $44,132.69, accounting for the SFIP's post-FIRM elevated coverage limits. (Def.'s Mot., Ex. 11, bates nos. 106-07.) FEMA advanced Plaintiffs $35,000 and Plaintiffs signed a "non-waiver agreement" acknowledging that FEMA would continue to investigate Plaintiffs' claim.  (Id. at bates no. 116.)

FEMA's investigation ultimately determined that the house was post-FIRM elevated and thus subject to the SFIP coverage limitations. (Def.'s Mot., Ex. 24.) According to FEMA, the house was originally non-elevated and insured as such through the NFIP by its previous owners, the Munns. Following a flood in 2001, Hatboro declared the property damaged and in need of substantial repairs. Because a FIRM had been issued for Hatboro by that time, the repairs were

3

required to meet local flood plain construction standards, which meant that the living area had to be elevated above base flood level. Using their SFIP benefits and an additional FEMA grant, the Munns elevated the house on a concrete-block wall foundation, such that the entire house was above base flood level. Thus, the new lowest level—enclosed by the concrete-block wall—was only permitted to be used as storage, parking, or building access. As required by the SFIP, the concrete walls were equipped with flood vents, which are openings in the wall that serve to equalize water pressure in the event of a flood. (Def.'s Mot., Exs. 12-23.) The construction changed the status of the house from pre-FIRM non-elevated to post-FIRM elevated. The lowest level, however, was finished and turned into a living area at a later, unknown date.  Plaintiffs deny having known at the time they purchased the house or when they sought an SFIP that the house had been elevated by the Munns.

Based on the above information, FEMA partially denied Plaintiffs' claim, applying the coverage limits pertaining to post-FIRM elevated buildings. (Def.'s Mot., Ex. 24.) FEMA ultimately paid Plaintiffs $40,627.69 for building damages and $3,505.00 for contents from the first flood, and an additional $8,429.57 in building damages from the second flood. (Def.'s Mot, Exs. 1, 9, 10, 30, 31.) Plaintiffs unsuccessfully appealed the partial denial to FEMA on the basis that the house was non-elevated. (Def.'s Exs. 25, 27.) Plaintiffs no longer maintain this position and concede that the house is elevated. (Pls.' Stat. of Facts ¶¶ 3-5.) Instead, Plaintiffs argue that Defendant is estopped from denying coverage as a result of having agreed to insure the home as non-elevated, which Plaintiffs claim is evidenced by the "declarations page" of their policy. (Def.'s Mot., Ex. 7.)

Plaintiffs filed their complaint on August 14, 2012, seeking the full amount available under the policy for the August flood, plus $26,000 for the September flood, for a total of

4

$169,700. Defendant filed its motion for summary judgment on November 22, 2013, arguing that the status of the house as post-FIRM elevated precludes any payments beyond the applicable limits found in the SFIP.

## III.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A).

## IV.   DISCUSSION

Notwithstanding the declarations page description of Plaintiffs' house as "non-elevated without basement," the record reflects that the house is in fact a post-FIRM elevated structure. (Def.'s Stat. of Facts ¶ 13; Def.'s Mot., Exs. 7, 12-23; Pls.' Stat. of Facts ¶ 2.) The house was elevated by the Munns between 2002 and 2003 following a flood. Although Plaintiffs claim not to have known about the elevation when they purchased the house, they do not dispute that the house is elevated at this time. (Def.'s Mot. Exs. 12-23.) Defendant argues that this fact alone dictates that the coverage limits pertaining to elevated structures set forth in Section III A(8) and B(3) of the SFIP apply, necessitating judgment be entered in its favored.

The SFIP entitles its purchasers to insurance "under the terms of the National Flood Insurance Act of 1968[,]" provided that they:

> (1) Have paid the correct premium;
>
> (2) Comply with all terms and conditions of this policy; and
>
> (3) Have furnished accurate information and statements.

44 C.F.R § 61, App. A(1)(I).

The policy continues: "We have the right to review the information you give us at any time and to revise your policy based on our review." Id. Defendant contends that this is exactly

what happened in Plaintiffs' case: FEMA conducted an investigation after questions arose about the elevation of the house and determined that, contrary to the information provided by Plaintiffs when they applied for the policy, the house was in fact post-FIRM elevated. FEMA then applied the coverage limits pertaining to elevated structures and paid Plaintiffs accordingly. While Plaintiffs claim to have been unaware that the house was elevated at the time they purchased it from the Munns, Defendant argues that this assertion is: (a) belied by the disclosures made by the Munns upon selling the house to Plaintiffs; and (b) immaterial, as the SFIP and the limits therein are federal regulations requiring coverage consistent with the <u>actual</u> status of the house, rather than Plaintiffs' mistaken characterization of it. Plaintiffs' sole argument in response is that Defendant is estopped from denying Plaintiffs' coverage in the full amount of their policy due to Defendant's conduct at the time it agreed to insure the house.

The doctrine of equitable estoppel is "grounded on a notion of fair dealing and good conscience" <u>Gibbs ex rel. Gibbs v. Carnival Cruise Lines</u>, 314 F.3d 125, 133 (3d Cir. 2002) (internal quotation marks omitted). Traditionally, it is applied to preclude a party who has made representations of fact through words or conduct from asserting rights against a person who has reasonably relied on those words or conduct to his detriment. <u>Id.</u> (citing <u>Oxford Shipping Co., Ltd. v. New Hampshire Trading Corp.</u>, 697 F.2d 1, 4 (1st Cir. 1982)). Plaintiffs contend that, at the time Defendant agreed to insure Plaintiffs' house, it knew that the building was post-FIRM elevated, but did not disclose that information to Plaintiffs.[2] Plaintiffs claim that they reasonably relied on Defendant's non-disclosure of this information and subsequent agreement to insure the house as non-elevated to their detriment. Had they known that their house was subject to the coverage limits, Plaintiffs contend, they would have taken the necessary steps to adequately

---

[2] That Defendant knew the status of the house is purportedly evidenced by the fact that the Munns elevated the house using NFIP payments and a FEMA grant.

insure it. Plaintiffs point to the policy's declarations page, which describes the house as non-elevated without basement, as proof that Defendant agreed to insure the property on this basis. As a result, Plaintiffs urge that Defendant should be estopped from denying coverage.

Defendant responds that: (1) equitable estoppel cannot be invoked to obtain an improper payment from the United States Treasury; (2) precedent establishes that an SFIP declarations page comprises representations made by the insured to the insurer and not the other way around, and that estoppel does not apply in SFIP coverage cases; and (3) Plaintiffs fail to meet their burden for applying estoppel, because they have not demonstrated that Defendant knew that the house was elevated and, more importantly, Plaintiffs themselves knew or should have known that it was elevated. We will address these arguments in turn.

The United States Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. The question arises, then, whether the equitable doctrine of estoppel based on the conduct of government officials or agencies can constitutionally result in payment from the government that would otherwise be prohibited by law. The United States Supreme Court addressed this question at length in Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 424 (1990), finding that it cannot. Id. at 426. While declining to adopt an across-the-board rule prohibiting the use of estoppel against the government, the Court explained that "[i]f agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive." Id. at 428. Thus, applying the doctrine of estoppel to compel Treasury payments would render the Appropriations Clause a nullity. Simply put, "[c]ourts cannot estop the Constitution." Id. at 434. Accordingly, Plaintiffs cannot claim payments based

on Defendant's conduct that would otherwise contravene the law and regulations constituting the NFIP.

The NFIP regulations provide that "[t]he standard flood insurance policy is authorized only under terms and conditions established by Federal statute, the program's regulations, the Administrator's interpretations and the express terms of the policy itself. As such, representations regarding the extent and scope of coverage which are not consistent with the National Flood Insurance Act of 1968, as amended, or the Program's regulations, are void." 44 C.F.R. § 61.5. We read this language to directly preclude Plaintiffs from claiming coverage based on Defendant's conduct. Other courts addressing this very issue agree and have held that estoppel cannot apply, or if it can, that it did not apply in similar situations. As set forth infra, precedent supports Defendant's contention that an SFIP's declarations page is merely a computer-generated summary of representations made by the insured to the insurers, which does not define the limits of coverage or bind the insurer. Rather, coverage limits are established by the federal laws and regulations that make up the NFIP.

In Garcia v. Omaha Property and Cas. Ins. Co., 933 F.Supp. 1064 (S.D. Fla., 1995) aff'd, 95 F.3d 58 (11th Cir. 1996), the plaintiff sued a private insurer from whom he had purchased flood insurance through the NFIP's Write Your Own program. After the plaintiff's three-story residence suffered flood damage as a result of Hurricane Andrew, the plaintiff submitted a claim that was partially paid and partially denied. The insurer paid for damage to the top two floors of the house, but denied payment for damage to the first floor. Id. at 1065. The insurer explained that the houses in the plaintiff's development should have been rated as elevated for the purposes of the NFIP, and thus were subject to the limitations in coverage that apply to elevated structures. Id. at 1066.

While the parties did not dispute that the home was post-FIRM, the declarations page of the plaintiff's SFIP contained the notation "non-elevated building." Yet, the elevation data clearly established that the building was elevated above sixteen feet. Noting that the SFIP defines the policy's declarations page as "a computer generated summary of information furnished by [the insured] in the application for insurance," the court found that the contradiction between the declarations page and the actual elevation of the house did not entitle the plaintiff to full payment contrary to federal regulations, but rather would normally result in voiding the policy for mutual mistake of the parties, which the insurer did not seek. Id. at 1069.

The plaintiff also argued that the insurer was estopped from denying coverage because a previous claim he had filed was paid as if the house was non-elevated.  The court also rejected this argument, holding that an earlier improper payment of government funds cannot bar the insurer from later assessing the property in accordance with FEMA directives. Id. at 1070.

The United States Court of Appeals for the Eleventh Circuit adopted similar reasoning in Carneiro Da Cunha v. Standard Fire Ins. Company/Aetna Flood Ins. Program, 129 F.3d 581, (11th Cir. 1997). Appellants in that case owned three-story townhouses in the same development at issue in Garcia, all insured through the NFIP and flooded during Hurricane Andrew. A FIRM was in place for the area that established a base flood elevation of 10-12 feet. The insurers determined that the ground floors of the townhouses, which were below base flood elevation, were used as living areas, contrary to local and federal regulations.  Accordingly, the insurers partially denied the claims.

The plaintiffs argued that the policies were ambiguous and should be construed against the insurer, because some of their declarations pages described the homes as "non-elevated." The court disagreed, noting that the declarations page is a summary of information provided by

10

the insured and not a promise to provide coverage, and that the policy clearly states that coverage is limited by federal regulation. Id. at 587.

The plaintiffs next argued that the insurer should be estopped from denying coverage, because it knew that the ground floors were being used a habitable space at the time it agreed to insure. The court held that even if estoppel could apply, the elements of estoppel were not met, as there was no evidence that the insurer had assured the plaintiffs that the lowest floors would be covered. The court also found that the declarations page could not reasonably lead an insured to believe that the lowest floor was covered, because it would have been clear to any owner that the lowest floor was not elevated above the base flood elevation. Id. at 588.

Finally, In Goldman v. Witt, 1994 WL 905577 (D.N.J. 1994), a group of plaintiffs insured through the NFIP—some through FEMA directly and some through WYO private insurers—submitted claims that were partially denied when it was found that their ground floors were below base flood elevation. The ground floors were originally intended to be used only for storage/laundry, but at some point were converted to habitable space. The court found that many of the plaintiffs had inaccurately described their houses as non-elevated when applying for flood insurance. Id. at 1-2.

Several of the plaintiffs who had been paid claims earlier as if their lowest levels were fully covered argued that the government should be estopped from denying them coverage in this instance. The district court noted preliminarily that estoppel should only be used against the government in extreme cases. Id. at 5. In the Third Circuit, this has traditionally required affirmative misconduct on the part of the government. Id. (citing United States v. Asmar, 827 F.2d 907, 912 (3d Cir. 1987)). The district court held that even if estoppel could be invoked against FEMA, the only plaintiff who had presented evidence that he relied on the government's

11

previous payment had improperly accepted money based on his own inaccurate description of his property. Thus, the court ruled that FEMA's failure to detect that inaccuracy once should not bar it from later accurately assessing the property.[3] Id.

Here, Plaintiffs' estoppel argument presents a slightly new twist in that Plaintiffs claim that Defendant knew, but did not disclose the status of the house to Plaintiffs at the time they bought their policy.  In effect, however, Plaintiffs ask us to do the same thing that the above courts declined to do: determine the extent of coverage under an SFIP based on the purported representations, non-disclosures or other conduct of government officials, rather than the federal laws and regulations that explicitly lay out what is covered and what is not. We agree with the above courts that to do so would be improper. The SFIP declarations page is "a computer-generated summary of information [the insured] provided in the application for insurance," and not representations that bind the insurer. 44 C.F.R. § 61, App. A(1)(II)(B)(10). As to the claim that Defendant knew but did not disclose the true status of the house, even if true, it does not negate the explicit language in the SFIP requiring homeowners to furnish accurate information, granting FEMA the right to review and revise the policy, and strictly limiting coverage for post-FIRM elevated structures.

Finally, we agree with Defendant that even if estoppel could, in theory apply in SFIP coverage cases, Plaintiffs have not met their burden here. We agree with Defendant's contention that Plaintiffs cannot claim to have relied on any information provided by Defendant regarding the elevation of the house. This is because Plaintiffs either knew or should have known that the house was elevated. Indeed, the undisputed record reflects that upon selling the house to

---

[3] See also Benbenek v. Fidelity Nat. Property and Cas. Ins. Co., 2013 WL 5366395 (S.D. Ind. 2013), in which the court noted that "no federal court has ever upheld a claim of equitable estoppel by an insured seeking an award of public funds under a [SFIP]." Benbenek 2013 WL 5366395, at *8 (quoting Bruinsma v. State Farm Fire & Cas. Co., 410 F. Supp. 2d 628, 635 (W.D. Mich. 2006)).

Plaintiffs, the Munns disclosed that the house had been lifted thirteen feet. (Def.'s Mot., Ex. 23.)

Regardless of what Defendant knew, Plaintiffs themselves knew or had information showing that

the house was elevated, and thus could not reasonably rely on Defendant's non-disclosure of that

same information.[4]

**V.     CONCLUSION**

For the reasons set forth above, Defendant's motion will be granted. As a result,

Defendant's two motions in limine seeking to limit the testimony of Plaintiffs' experts and

second motion to compel will be denied as moot. Our order follows.

---

[4] Defendant also argues that because Plaintiffs' house was not insured to 80% of replacement cost value, Plaintiffs are entitled only to the actual cash value of their loss, which is defined as the cost to replace the property at the time of the loss, less the value of physical depreciation. 44 C.F.R. § 61, App. A(1)(II)(B)(2). The SFIP section VII(V)(1)(a)(2) provides replacement cost value only for homes insured for up to 80% of their replacement cost value. Plaintiffs offer no response to Defendant's contention that they are not entitled to replacement cost value. Further, there is evidence of record showing that the house was not insured to 80% of replacement cost value. (Def.'s Mot., Ex. 32.) Accordingly, we find that Plaintiffs are entitled only to actual cash value of their loss.